Good morning, Your Honors, and may it please the Court, Cindy Mudo, Federal Defenders, on behalf of Mr. Centeno, I would like to reserve three minutes of my time for rebuttal and I will keep my eye on the clock. This Court should remand for two reasons. First, the District Court erred when it failed to conduct the third step of Batson by not considering whether the prosecutor's explanation for its use of preemptory strikes was pretext for purposeful discrimination. And second, the District Court denied Mr. Centeno a meaningful opportunity to present a defense when it excluded all mention of Olanzapine, the common thread that made Mr. Centeno's documents relevant and his defense plausible. Turning to my first point, the only Batson issue before the Court is whether the District Court conducted the third step of Batson. Steps 1 and 2 of Batson are non-issues because at trial, the prosecutor proffered reasons defending its use of preemptory strikes against women. That's in the record at 2 ER 214. And the government doesn't dispute that the proffer occurred or that the proffer went to the second step of Batson. And that's important because in Hernandez v. New York, the Supreme Court recognized that once a prosecutor proffers reasons at step 2 of Batson, step 1 is moot. Well, what Hernandez says is that once the prosecutor proffers reasons and the District Court makes a determination that there was no intentional discrimination, then step 1 is moot. But here, I mean, it's at least ambiguous, and I understand your submission to be that the District Court did not make a determination that there was no intentional discrimination. So I'm not sure Hernandez quite says that in that situation, you can skip step 1, does it? The Court is correct, but I think all of the case law, including case law from this Court in United States v. McHale, we see that the facts before the courts in all of those cases, they do talk about the third step, but I think the difference is the reasoning described in the holdings of those cases, which is that the courts are applying an employment law principle that indicates once the, in this case, the prosecutor provides a response regarding or defending its use of strikes, then by virtue of that, the first step is moot because they're already defending the strikes in this case. So I take the point, but if we were to look at the first step, you have six strikes, right? If you make six strikes at random, like just by flipping a coin or names out of a hat or whatever, only about a third of the time will they be 3-3 men and women, two-thirds of the time it will be more lopsided than that, and since you can have a JEB challenge for excluding men as well as excluding women, so it seems sort of odd to say that there's a prima facie case when, I guess, would your position be that any time it's more lopsided than 3-3, that's a prima facie case? It could be, Your Honor, I think it's fact-dependent, but the important point is that even striking a single juror for a discriminatory purpose is unconstitutional. Well, sure, but the question at step one is just what's a prima facie case, and it seems strange to define a prima facie case in such a way that most of the time, even if the strikes are being made at random, there will be enough of an anomaly to call it a prima facie case. I think that's why there's steps two and step three of Batson, and so at the first step, it's just prima facie case, and then the second step, the prosecutor would have an opportunity to proffer reasons or explain the reason for its use of those strikes, and then at the third step of Batson, the question is whether those explanations given by the prosecutor were pretexts for purposeful discrimination. And to answer whether the district court conducted the third step at Batson, the government hinges its entire argument on the fact that the district court used the word fair, and I think it's important to look at the context surrounding the use of the word fair. We see in the record at 2ER215 that what occurred was that the prosecutor provided its explanation, then in response, the district court said, quote, the court believes that's a fair explanation. And so looking at the record, we see that what the court was describing as fair was the explanation proffered by the prosecutor. And that is addressing step two of Batson and not step three, because at step two, the question is whether the prosecutor provided a permissible gender-neutral justification for its use of strikes. Here the court said that it was fair, answering step two. That's very distinct from the question at step three, which is whether that explanation proffered by the prosecutor was pretext for purposeful discrimination or not. Is there an objection at the time or a request that the district court make an express finding on the pretext issue? No, Your Honor. The government did not indicate that the defense did not raise a prima facie case. The government actually responded to the court's question whether they had a fair reason on two occasions. The record is a little bit split as to how that happened. What occurred was that Mr. Centeno first made his Batson challenge, then the court asked whether the government had a fair reason. The single response was yes, and then the court moved on. But later on, we see in the record at 2ER214 that the prosecutor then asked for an opportunity to be able to provide or supplement the record to provide its reasons for the strikes. Because the district court did not conduct the third step of Batson, the appropriate remedy here is to remand so that the district court can conduct the third step of Batson in the first instance. That's permitted by this court's case in... Counsel, didn't Ms. Wang say, I believe it's up to the defendant to make a prima facie showing of discriminatory intent first, and then the court seems to cut her off and say, did you have valid reasons? And Ms. Wang, by the way, is this Rosalyn Wang? No, it's Amy Wang. Pardon me? Amy Wang. Amy Wang, okay. Yes, Your Honor. And then the court denies the Batson motion. Your Honor... It's a shortcut. There's a lot of implied rulings in that, right? I agree with the court, and I think that's part of the reason why we believe the remand is the most appropriate remedy, because the district court was the one who was there who can answer the third question of Batson. But to answer the court's question here about what the prosecutor said at the time, what's important is that the court asked the prosecutor for reasons, and the prosecutor responded. And so at that point, even though the court is correct that the court didn't specifically say, yes, a prima facie case was met, by virtue of asking the prosecutor to proffer reasons for its use of strikes, it's demonstrating that the first step was met and is now moving on to step two. Turning to my second point, the district court erred in excluding any mention of Olanzapain. I wanted to first begin by correcting a misperception from the record. Contrary to the government's brief, Mr. Santeno was never allowed to say that it was the same medication. What we see in the record at 2 ER 306 was that the court asked the prosecutor whether they would allow Mr. Santeno to say that it was the same medication. The government and the prosecutor at the time did not want to allow Mr. Santeno to say that it was the same medication, ultimately objected to it, and the court, quote, said that they disallowed it. That's in the record at 2 ER 306. And in doing so, the district court erred in its application of Rule 403 because it overlooked the legal standard that emphasizes the exclusion of a criminal defendant's evidence under Rule 403 is an extraordinary remedy that should be used sparingly. That's from United States v. Hashir and United States v. Mende. And here, the United States district court did not express any caution when choosing to exclude this evidence as it should have under this legal precedent. We see in Hashir that the exclusion of evidence that was excluded there was evidence that strongly supported the defendant's primary defense, and the court found that it was fair for the court to do so. In Mende, the evidence that was excluded was evidence that was clearly probative of the defendant's knowledge, which was an issue in the case. Here, Mr. Santeno was attempting to admit evidence of the same medication, the medication that was found in the documents that he had with him when he came to the port of entry, which were documents from a previous time that he was in custody showing that he obtained a lansipine then, an address book that he had with him when he came to the port of entry that, again, had a lansipine. And separately, a third document, which was that he actually did obtain a lansipine once he was arrested. Was your client prejudiced by not being able to say that it was the same drug or it was a lansipine every time? He was denied the opportunity to present a meaningful defense and a full defense, and that's because Mr. Santeno was not able to create the connection. The only issue, really, the entire trial hinged on the element of specific intent, whether Mr. Santeno wanted to come into the United States to get arrested or whether he wanted to come into the United States to enter free from official restraint, to be free within the community. And so the government's argument was that he didn't want to get arrested. He wanted to sneak in and be here, whereas Mr. Santeno was using a lansipine to show that really what he wanted to do was be arrested. And that's important because it's kind of contradictory to say somebody wants to get arrested, I think. And so a lansipine is what allowed Mr. Santeno or would have allowed Mr. Santeno to show the reason why. Why would an individual want to ever be arrested? In Mr. Santeno's case, that's because he wanted to obtain that same medication. Medication he previously received, medication he was hoping to receive, and medication he did actually receive. And so for the jury, you know, had that been presented and had the jury accepted it, I mean, how would they have dealt with the fact that when he initially went to the border, he falsely claimed to be a U.S. national? Because I'm sort of putting myself in the frame of mind of a juror. I'm having trouble understanding how they would reconcile that with a desire to be taken into custody rather than a desire to be let into the United States free from restraint. Your Honor, because it goes to the why. Why would he come to the port of entry? Why would he say those things? Why would he want to get arrested? I think in addition to the facts that the Court mentioned about him stating he was a United States citizen, he also gave his full name, full date of birth. That ties to the fact that he was previously arrested, which is when he received Olanzapine. And so Olanzapine created that common thread throughout his documents that he had with him, what he said when he showed up to the port of entry, and what actually happened after he was arrested. And so the jury would have had to believe that, you know, had he not been sent to secondary inspection, his intent was to say, wait, wait, wait, if the guy had said, okay, thanks, you go on, you know, you waved him through, he would then have had the intent to say, like, no, no, no, please don't let me in. I'm only here to be arrested. That's right, Your Honor. But I think that's why the appropriate remedy is to remand, to allow the jury to hear this evidence, to allow Mr. Centennial to present that full, meaningful defense so that he's able to present this to the jury, to thread that very important fact in support of his defense. And, you know, I think ultimately the court's correct. It's up to the jury to decide whether or not Mr. Centennial is guilty or not. But really, the issue here is whether or not Mr. Centennial should have been provided that meaningful opportunity to present that defense to the jury. Right. But I mean, I guess at this stage, it's perhaps a question of whether the error might have been harmless or not, so. And Your Honor, we believe that the standard that the court should apply is that the conviction must be reversed unless the government can establish that the error was harmless beyond a reasonable doubt. And we don't think the government has met their burden here. The sole argument that they point to is the fact that Mr. Centennial was able to admit some of the other evidence that we were able to present. But again, I think there's a distinction between evidence that we were able to present that he wanted to get arrested versus the why. And the why ultimately here is what made it, what would make it a meaningful, full and complete defense that Mr. Centennial wasn't allowed to present. So while we were able to talk about other things, like other items that he had with him, we weren't able to discuss that same medication that was throughout his documents. And can you, I mean, even, so the district court judge also prevent, precluded you from saying that it was the same medication that, throughout, that he was seeking? Yes, that's correct. She did not allow us to say that it was the same medication or even that it was a certain medication. So she did not let us thread that common thread throughout. So, and you referred us to page 306. I mean, there the court does say, you can just say, did he get medication and then was the medication the same? So that seems like it was inviting you to do what Judge Wardlaw just suggested. Your Honor, if I can briefly respond, I see my time is elapsing. The court is correct, but if we keep going down that same page of 306, we see that the very bottom, the court disallows it. And so there's a conversation between the court with defense counsel and with the prosecution. And what the court is asking is whether or not the prosecutor would allow Mr. Centeno to say if it was the same medication. Ms. Luce is the prosecutor. She explains why she doesn't believe that's the case. And then ultimately the court says, I disallow it. On the following page, the record at 307, we see that the court again explains that she's disallowing it. In the middle of the page, I'm looking at line 15, the court says, would you object if she said he did receive certain medication? So the court even walks it back from say medication, asks if he can say certain medication. Again, the government objects to that. And ultimately on the next page, the court denies it at this time. Seems kind of odd that the district court judge is asking the prosecutor whether he or she would allow something. I mean, the district court judge has the power to allow it or not allow it. I agree with the court. Okay. Thank you. I'll give you some rebuttal time. Thank you. Good morning, your honors. And may it please the court, Andrew Hayden on behalf of the United States. There is no evidence the prosecution was concerned about gender when it used four peremptory strikes on female jurors. I want to start with the prima facie case discussion that was being had. There was no definitive prima facie ruling, and that's why it's important to note that not like a coin flip, but in this case, four of six. When you look at a prima facie case, you can also then look to the other facts and relevant circumstances of the case. And there's nothing about Mr. Centeno's case that would imply that the prosecution was focused on gender. It doesn't make sense, though, to go back and revisit the first step of Batson, whether there's a prima facie case when we've already proceeded to the second step and the government has presented reasons. It just seems as though the first question is mooted by, it should be mooted by that because you're presenting, and I know it wasn't you, but the counsel did say that we have a valid reason, we have a fair reason, and the court ruled that it was fair. She didn't say it was not pretextual, but she said it was fair. This is the experience as a court judge. I think that's what she was saying by saying it's fair. So why are we even going back to whether or not a prima facie case was established? Sure. Your Honor, in the first instance, it's the United States' position that the court doesn't need to because if we move through all three steps and if all three steps were completed, which the United States believes they were, the record could be more robust. But you see Judge Huff saying in the end, ticking through as she listens to each other for the strikes of the prospective jurors, that's fair, that's a fair reason, that's fair, that's non-discriminatory. She says that at the end. And so based on that analysis, and then the defense comes back, and on ER page 216, they're given an opportunity to explain more about why they've proven purposeful discrimination, and they focus on the jurors that the United States has stricken based on their perspectives of immigration and deportations, which was relevant to the case. So to take Your Honor's point, the United States' primary position is, although the record could have been more robust, all three steps were conducted by the district court and denied. But if there was no meaningful review... Yes, you want to say if we're inclined to reverse because she didn't say make the third, finding a third step, then you want us to look at the prima facie case. Then you can. But even if the court thinks that it was met because now we... Maybe we should make clear that... I don't know. We don't like to impose magic words on district courts, but maybe district courts should make clear what their ruling is at each step. But that's in order not to create appellate issues. Your Honor, I think this court has recognized, especially when the court's doing oral rulings in the context of BATS, and that the paragon of clarity is not required. And the United States agrees. But the record in a more holistic frame, if you look at the initial assertion, four out of six, not rising the level of six of six. If the United States was... If the prosecutors were focused improperly on gender, the ultimate jury was eight for 12, female nine for 14 when you include... What was the veneer pool like? What percentage was when they came in as a pool? Right before the peremptories, Your Honor, as best we can tell, because this is one of the challenges, is picking up gender. But before the peremptory strikes, it was split 15 for 15. So sort of picking up on Judge Miller's comment, at that point, three of six peremptories would have been consistent with the panel. But all four of the strikes that the United States chose to exercise, there were comments in the record that justified gender neutral reasons that were non-discriminatory for the strikes to be expressed. Never mind. Your Honor, so I think that that goes to the point, though, if this court... The United States doesn't think that magic words need to be used, but this record could have been more robust. But maybe the point, too, is that the defense has requested a remand. And under Nishida, for example, this court has held that if a hearing like that would be helpful to further develop the record, then that can be an appropriate remedy. But more specifically, and more recently, or in 2015, this court in Alvarez-Uloa said that the de novo review can be more appropriate when there is a sufficient record and there's nothing that a hearing, long attenuated in time from the original trial, would illuminate the records in a significant way. For example, if the strikes that had been used by the prosecutor had relied on the tone or the demeanor of the prospective jurors, but that's not the case here. The reasons that the prosecutors used to strike all four of the female jurors that are at issue were based purely on their narrative responses to the district court's questions. And so it was the district court's interaction with them, and then it's the prosecutor using the semantic language of their answers to justify their strikes. So the record here is sufficiently developed. So if the court thinks that the third step wasn't meaningfully done, a remand's not necessary because the record exists and this court can do a meaningful de novo review. I think the second argument is a stronger argument. So assume with me that I would think that it was the evidence that it was the same medicine or it was Olanzapine would have bolstered the defense and that the failure to let that evidence in hampered the constitutional right to have a complete defense. Why is it harmless beyond a reasonable doubt? Sure. A couple things. First, Your Honor, the United States respectfully disagrees with the characterization of the record. On page 306, the district court does say you can say the same medication. But here's what didn't. Right, but then the prosecutor objected to that. Well, the prosecutor, the concern was if you look at the record, Your Honor, the defense attorney is concerned. At that point, they're cross-examining the AFILE custodian. And the defense attorney says, well, this witness doesn't have personal knowledge that it was the same medication. And similarly, the doctor wouldn't have personal knowledge of the medications prescribed in a previous custodial term. But what we've mentioned in our brief is the evidence of Olanzapine was already in the record. The address book that had Olanzapine written in it, unredacted, had already been admitted. And so there could have been a posture where the defense attorney could have simply asked the doctor, can you please look at what has been previously admitted? Do you see the same medications that you prescribed in this previous address book? But more importantly, to your point, Your Honor, in order for this court to reach the harmless error analysis, or the reasonable doubt analysis, it would have to be that they were meaningfully denied a complete defense. And that's not borne out in the record. The defense actually opened on this theme. On ER page 211, in the opening statement, they told the jury that he was coming back for medication that he had been given in custody. And then in closing, they argued on page 462, he wanted his medication. They were able to make those arguments. And so the United States position is the specific name of the narcotic, the antipsychotic medication, only invited confusion or speculation and wasn't necessary for that complete defense. Because they argued more completely that he was cold, hungry, dirty. He didn't have cash or cell phone. He had his birth certificate and gave his correct name. The totality of the circumstances, including getting medication, were much stronger than the specific name of the medication. So I mean, I take the argument from your friend on the other side to be sort of the flip side of old chief, right? I mean, like, that they're entitled to present, like, their story in some coherent way with all of the details, not some, you know, sanitized, stylized version that requires the jury to connect a medication to a medication. So, I mean, and like, including all the details is a more effective way of telling a story. So why aren't they entitled to do that? Your Honor, it's because in this specific case, the rules of evidence still control. And the 403 limitations on this specific medication. Olanzapine is an antipsychotic. The defense prior to trial had not noticed under Rule 12 insanity defense or diminished capacity defense. So the specific nature of the medication, which had the potential to be confusing, misleading, and highly inflammatory, and wasn't relevant to the defense's ability to form the appropriate mens rea to commit the crime in this case, had the real potential to be a distraction and cause the jury to investigate other things. Do you think the jury would know what Olanzapine is? I think it's possible that they would have speculated when given that level of specificity,  Let me just ask you this. Couldn't a jury instruction have cured any of that? And especially since there wasn't a defense of insanity? Your Honor, there perhaps could have been a curative that could have instructed them. It also could have highlighted or drawn more attention to the specific nature of that medication. OK, but what about the fallback to say it was the same medication he was returning for? Why was that disallowed? Your Honor, respectfully, we would contend it was not disallowed. It was just that the defense didn't perceive the way to get to that actual argument. They could have done it under 8036, or they could have done it under drawing, having subsequent witnesses look at evidence that had already been admitted. And so when Judge Huff asks the prosecutor, will you agree? It really is the AFILE custodian going to agree in his personal knowledge that they were the same, and he didn't have the ability to swear to that under oath. But those evidentiary links could have been put together in other ways. And to go originally to your point about harmlessness, Your Honor, we're talking about one piece of the puzzle. The briefs on appeal make it seem that elansepine was the crucial piece, that that was the kingpin to the entire argument. But really, with the evidence that was presented, and if you look at the cross-examinations by the defense, they painted the whole picture about everything that Mr. Centeno did and did not bring to the port of entry that day. And the jury heard all of that. They heard all of those reasons. And to pick up on what Judge Miller had referenced, what they also heard is that the first thing he said when he got to the port is that he was American and he presented a California ID. And that that was what they considered in the context of him, them being arrested, having made substantial steps to try to enter the United States free from official restraint. Saying I'm an American the same as saying I'm a U.S. citizen? I think in that context, in that colloquial context, I would think it is, Your Honor. You're at a port of entry talking to a customs officer. I think you're requesting entry based on citizenship because that is the import of the inquiry as you stand there at the booth. And they were able, the jury heard that, and they were then able to balance that against the totality of the other facts that the defense had argued, and they rejected it. And more importantly, Your Honor, I think in regards to the district court's allowance of that specific name, because the defense was not precluded from presenting a complete defense, they may have been not allowed that one specific name, they were back in abusive discretion. And so it's not illogical or implausible for Judge Huff to have felt like this could be confusing, misleading, unduly prejudicial, all words that had come up in the context of these discussions. Thank you, Your Honor. All right, Ms. Murrow, I'll give you two minutes. A few points, Your Honors. To start, the government conceded that the record could have been more robust. That's important when discussing Batson, because the appropriate remedy here is remand. The record isn't clear enough for the court to conduct the third step of Batson in the first instance on appeal. And it also shows that the third step of Batson was not conducted, because at a minimum, for the third step of Batson, the court must include a clear record that the trial court made a deliberate determination. So while the court is correct that there's no need for magical words, there does need to be a clear record that that deliberate determination was made at step three. Second, and turning to my second point regarding the same medication, there's a difference between being able to say that Mr. Sinthenil wanted to obtain medication versus the same medication or the same prescription medication, oral lansipine. And the reason why that's different is because, and we talk a little bit about it in our briefing, is that medication can include anything like Tylenol or Motrin, something that's over-the-counter. The same medication is what threads the loop on it being the same medication found in the documents he had from his prior time in custody, in the address book, and that he also obtained afterwards. And then prescription medication obviously adds another layer indicating that it was a prescription medication. So any confusion of the jury could have been dissuaded, as the court noted, through a curative instruction, things of that sort. And to address the government's contention that Mr. Sinthenil would have otherwise been able to indicate that it was the same medication, possibly through other forms or other avenues in other witnesses, that's incorrect. After Mr. Sinthenil admitted the address book that included the annotation of lansipine in it, Mr. Sinthenil then attempted to elicit from the defense investigator whether that same medication was also found in the documents that Mr. Sinthenil had on his person, and the court did not allow it. In fact, the court went into recess and discussed why the defense should not be allowed to say that it was the same medication or to say that it was lansipine. At every step that Mr. Sinthenil tried to discuss this same medication, because it was so important to his defense, the court disallowed it. Thank you. Thank you very much, counsel. U.S. v. Sinthenil will be submitted.
judges: WARDLAW, IKUTA, MILLER